AO 91 (REV.5/85) Criminal Complaint

AUSA M. DAVID WEISMAN, (312) 353-2119

**FILED**
MAR 1 1 2002
MICHAEL W. BOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JOSEPH KONOPKA

(Name and Address of Defendant)

DOCKETED
MAR 1 3 2002

MAGISTRATE JUDGE BOBRICK

CRIMINAL COMPLAINT
02CR0224

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __March 9, 2002,__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did, (Track Statutory Language of Offense)

knowingly possess a chemical weapon,

in violation of Title __18__ United States Code, Section(s) __229(a)(1)__.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: _X_ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

MAR 1 1 2002
Date

at Chicago, Illinois
City and State

EDWARD A. BOBRICK, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS )
                  )
COUNTY OF COOK    )

## AFFIDAVIT

I, Leslie Lahr, being duly sworn depose and state as follows:

1. I, Leslie Lahr, am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed for more than three years. I am assigned to the investigation of various crimes, including the investigation of domestic terrorism and weapons of mass destruction.

2. I make this affidavit from personal knowledge based on my participation in this investigation, including review of records, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

3. On March 9, 2002, at approximately 2:15 a.m., Joseph Konopka ("Konopka") and a juvenile were arrested by University of Illinois at Chicago ("UIC") police officers for trespassing on university property. Specifically, Konopka and the juvenile were found in a steam tunnel of the UIC Education Building without permission or authorization to be there.

4. After his arrest, UIC officers determined that Konopka was wanted by federal authorities for Unlawful Flight to Avoid Prosecution in violation of 18 U.S.C. § 1073. The Unlawful Flight to Avoid Prosecution charges were filed in the Eastern District of Wisconsin after Konopka failed to appear on charges filed in Door County in Wisconsin alleging acts of vandalism against utility systems.

1

5. At the time of his arrest, UIC officers recovered a vial containing a powdery substance on Konopka's person.

6. On March 9, 2002, this substance was sent for analysis to a laboratory specializing in environmental toxins, and other chemical identifications. After analysis, laboratory personnel determined that the substance in Konopka's possession was 1 gram of sodium cyanide/sodium carbonate.

7. Later on March 9, 2002, FBI agents interviewed the juvenile who was arrested with Konopka. The juvenile stated that Konopka had taken over an area within a Chicago Transit Authority ("CTA") underground passageway, and that Konopka stored chemicals in the room.

8. On March 9, 2002, FBI agents interviewed Konopka about his activities. Konopka stated that he has committed computer hacking in the past, and knew that he was wanted on computer hacking charges in Wisconsin. Konopka also stated that he had keys to various CTA substations. He also stated that he was taking photographs of various CTA underground tunnels and posting digital images on the internet. He also stated that he was interested in digital photos of power substations, including transformers, that he found in various tunnels. Konopka also stated that he stole two laptop computers from Ameritech. He used one laptop to gain access to the internet through a wireless modem, and he gave the second laptop to an acquaintance of his.

9. Additionally, Konopka stated that he had stored chemicals at a CTA underground passageway near Dearborn and Washington in Chicago. Konopka stated that he had re-keyed the storage area to prevent people from entering it without Konopka's permission. Specifically, Konopka stated that he possessed a one pound jar (that was approximately

one-half full) of sodium cyanide in the CTA passageway along with other chemicals, including potassium cyanide. He also stated that he knew the cyanide was dangerous to humans. Konopka stated that he had a laptop computer with a wireless modem at the passageway. He also stated that he used the laptop computer for "war driving," which is way to access to networks without permission using a wireless modem.

10. During the evening of March 9, 2002, bomb technicians from the FBI and Chicago Police Department located the locked room that provided access to an underground CTA passageway where Konopka admitted to storing chemicals and other belongings. The passageway was located between Washington and Monroe underneath Dearborn Street.

11. After hazardous material teams from FBI and the Chicago Fire Department secured the room, FBI agents inventoried the materials stored in the passageway. Upon inspection, these technicians observed a laptop computer in the room, which was on but in a standby mode. In the passageway, the following materials were found:

    a. Container marked mercuric sulfate

    b. Container marked sodium cyanide

    c. Container marked potassium cyanide

    d. Container marked salicilic acid

    e. Container marked phenylpheline

    f. Container marked potassium chlorate

    g. Container marked potassium pheric cyanide

12. The contents of the two containers marked as containing cyanide have been analyzed by the same laboratory that analyzed the sample as describe above. The container marked potassium cyanide contained approximately one-quarter pound of potassium cyanide in

powder form. The container marked sodium cyanide contained approximately .9 pounds of sodium cyanide in powder form.

13. On March 10, 2002, Konopka stated that beginning in the Spring of 1997 and continuing to January of 2001, he was involved in multiple acts of property damage including damage to utility facilities, cellular telephone facilities, sewage facilities, electrical power generation facilities, and water utility facilities. During his interview, Konopka also stated that he led a group of associates in Wisconsin, known as the "Realm of Chaos," the purpose of which was to take personal entertainment out of observing the consequences of the property damage. Specifically, Konopka admitted to damaging power substations and communication facilities by fire and other destructive means. He stated that on several occasions he threw barbed wire across feeder arrays at electrical power distribution substations. He also stated that he and other members entered various telecommunications and disrupted these facilities.

14. Title 18, United States Code, Section 229 provides in part as follows:

   (a) Except as provided in subsection (b), it shall be unlawful for any person knowingly–

   (1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon.

15. Title 18, United States Code, Section 229F (**"Definitions"**) provides in part:

   (1) **Chemical Weapon.** – The term "chemical weapon" means the following, together or separately:

   (A) A toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose....

   ....

4

(6) **Precursor.** –
(A) **In general.** – The term "precursor" means any chemical reactant which takes part at any stage in the production by whatever method of a toxic chemical....

....

(8) **Toxic chemical.**–
(A) **In general.**– The term "toxic chemical" means any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. The term includes all such chemicals, regardless of their origin or method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere.

16. The sodium cyanide and potassium cyanide recovered from the CTA passageway are toxic chemicals, as that term is defined under 18 U.S.C. §299F(8)(A) because if inhaled or ingested they can cause death, temporary incapacitation, or permanent harm to humans. Specifically, FBI Special Agent Howard Kaeding, who has received specialized training in chemical weapons, advised me that the potassium cyanide and sodium cyanide, if ingested, or if converted to gas form, could cause death to humans.

17. Subsection (b) of 18 U.S.C. § 229 identifies certain agencies and persons exempted from the prohibitions of the statute. These exemptions relate to entities of the United States, members of the armed forces of the United States, and persons "attempting to destroy or seize the weapon" in "an emergency situation." Konopka does not fit within any of the exemptions identified in 18 U.S.C. § 229(b).

18. Title 18, United States Code, Section 229F states in part as follows:

In this chapter:

(7) **Purposes not prohibited by this chapter.** – The term "purposes not prohibited by this chapter" means the following:

5

- (A) **Peaceful purposes.**– Any peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity.

- (B) **Protective purposes.**– Any purpose directly related to protection against toxic chemicals and to protection against chemical weapons.

- (C) **Unrelated military purposes.**– Any military purpose of the United States that is not connected with the use of a chemical weapon or that is not dependent on the use of the toxic or poisonous properties of the chemical weapon to cause death or other harm.

19. Konopka's purpose for possessing the sodium cyanide and potassium cyanide does not appear to fit within any of the categories permitted by 18 U.S.C. § 229. Konopka described himself to FBI agents as unemployed, and the investigating agents have found no basis to support a conclusion that he possessed the above-described chemicals for any work-related reason. In addition, Konopka has admitted stealing the cyanide and other chemicals, and knowing that cyanide is a dangerous chemical whose use could cause death or physical injury. The chemicals were stored in a non-public area of an urban mass transportation system, and shielded from detection by replacement of the lock on the storage room. In short, the evidence supports a conclusion that Konopka did not possess the potassium cyanide and sodium cyanide for peaceful purposes.


...


20. Based on the foregoing, I believe there exists probable cause to believe that Joseph Konopka knowingly possessed a chemical weapon in violation of 18 U.S.C. § 229.

_____
Special Agent Leslie Lahr
Federal Bureau of Investigation

Subscribed and sworn to before
me this 11th day of March, 2002

_____
Edward A. Bobrick
United States Magistrate Judge