IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

*MAR 1 1 2003*
*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 02 CR 224 |
| | ) | |
| v. | ) | Judge Wayne R. Anderson |
| | ) | |
| JOSEPH KONOPKA | ) | |

## NOTICE OF FILING AND CERTIFICATE OF SERVICE

To:   Mr. David Weisman                    Ms. Sheila Lally
       Assistant United States Attorney      U.S. Probation Officer        MAR 1 2 2003
       219 S. Dearborn Street                 55 E. Monroe, Suite 1500
       Chicago, IL   60604                    Chicago, IL   60603

Please take notice that on this 11th day of March, 2003, the undersigned filed the following document(s) in the above captioned cause, copies of which are attached hereto:

-       SENTENCING MEMORANDUM

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By: _____
      Matthew J. Madden

MATTHEW J. MADDEN
FEDERAL DEFENDER PROGRAM
55 E. Monroe Suite 2800
Chicago, IL 60603
(312) 621-8347

STATE OF ILLINOIS        )
                                    ) SS:
COUNTY OF COOK          )
       I, Laura B. Zuniga state that on the 11th day of March, 2003, I caused copies of the foregoing Motions to be hand delivered to the U.S. Attorney's Office at 219 S. Dearborn Street, Chicago, Illinois.

_____
Laura B. Zuniga

22

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

MAR 1 1 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. )  No. 02 CR 224
)
)  Judge Wayne R. Anderson
JOSEPH KONOPKA )
)

## SENTENCING MEMORANDUM

JOSEPH KONOPKA, by the Federal Defender Program and its attorney, MATTHEW
MADDEN, hereby provides the following mitigating information and respectfully requests a
sentence at the low-end of the applicable guideline range.

## I.    INTRODUCTION

Joseph Konopka was born and raised in the Green Bay, Wisconsin area. Although his
mother had an active role in his life, he was essentially raised by his maternal grandparents from
birth until age six and from the age of sixteen on. He never met his biological father, but
developed very close relationships with his grandfather and his uncle Daniel Konopka.

In conversations with counsel, Mr. Konopka has relayed that he developed an interest in
computers and "exploration" at a very young age. By the time he was fourteen, he was sneaking
out of the house at night to explore the city of Green Bay. He would travel miles on foot during
the night exploring railroad tracks, abandoned buildings, electrical systems, sewer tunnels, and
other aspects of Green Bay's infrastructure. Around 1992, Mr. Konopka began to participate in
computer-based bulletin boards where he met other people who shared an interest in exploration.
Much of his social life involved exploring rural areas of Wisconsin with people he met on the

22

Internet.

Mr. Konopka's interest in computers led him to a career in technology. Between November of 1996 and February of 2002, Mr. Konopka was steadily employed as an Internet technical support/system administrator. He found the job intellectually satisfying and had a high degree of responsibility at the job.

In 2001, Mr. Konopka was facing legal troubles in Wisconsin, primarily having to do with numerous acts of vandalism and destruction of property. In some cases, the damage was fairly extensive and required costly repairs. Yet it is important to note that no one was ever physically hurt by these actions. Prodded by a fear of going to jail, Mr. Konopka made a regrettable decision and jumped his bond in Wisconsin to travel to Chicago.

During the summer of 2001, Mr. Konopka was living on the streets of Chicago and was storing his personal belongings in a storage room near the Blue Line of the Chicago Transit Authority (CTA). Mr. Konopka spent a good deal of his time exploring the streets of Chicago and the tunnels below the city. He would commonly meet people to join him in his explorations through message boards at the website www.ChicagoUrbanExploration.com. At some point in late summer, Mr. Konopka and a companion came across an abandoned warehouse near 49th Street and Halsted Avenue. They entered the unlocked warehouse and began to explore. Eventually, they came upon a chemical storage room which was in a state of disrepair. Mr. Konopka took several bottles of chemicals from the warehouse, including a bottle of sodium cyanide and a bottle of potassium cyanide. *See* Government's Version, page 1. Mr. Konopka stored the chemicals with the rest of his personal belongings in a CTA storage closet just off the Blue Line subway. *Id.* at 2.

On March 9, 2002, Mr. Konopka and another individual were arrested for trespassing on the University of Illinois at Chicago (UIC) campus. While searching Mr. Konopka, officers recovered a vial with a white powdery substance. When questioned about the contents of the vial, Mr. Konopka informed the officers that he believed the white powdery substance to be cyanide. Mr. Konopka later informed authorities that he had larger quantities of cyanide stored with the rest of his belongings in the storage closet near the CTA Blue Line. *Id.* Mr. Konopka led authorities to the location of the storage closet where the chemicals were kept. See Pre-Sentence Investigation Report (PSR), page 2, lines 39-42.

On November 21, 2002, Mr. Konopka appeared before this Court and pled guilty to two counts of possession of a chemical weapon, namely cyanide, in violation of 18 U.S.C. §228(a)(1). Mr. Konopka recognizes the seriousness of his criminal conduct and regrets the actions that have led him to be in front of Your Honor in this case.

## II. MITIGATING FACTORS

### A. Every Indication Is That Mr. Konopka Had No Plans To Use The Cyanide To Hurt Anyone.

There was a very thorough investigation performed by the FBI in this case. Interviews were conducted of at least seven people who had associated with Mr. Konopka between the summer of 2001 and the time of his arrest in March, 2002. Although it appears that all of the people interviewed were very cooperative and forthcoming with the FBI, none of them reported any information to suggest that the defendant planned any use of the cyanide. *See* PSR, page 2, lines 52-55. The government is in agreement that there is no information to suggest that Mr. Konopka ever made any serious threat to use the materials in any way and there is no evidence

3

that Mr. Konopka had any plans to use the cyanide to injure others. Government's Version, page 3-4.

In addition, all of the evidence indicates that Mr. Konopka never specifically sought out this cyanide. He stumbled upon it in an abandoned warehouse with some other chemicals and made the extremely poor decision to take it. His poor decision-making was compounded when he stored the cyanide with the rest of his personal belongings in a storage room located in the subway. Mr. Konopka would sleep in this storage room on occasion, and he chose this location to store his belongings "because it was fairly sheltered, secure, unlikely to be happened upon by the public or CTA workers, and also because it was part of the ventilation shaft, it was fairly warm during the winter. [He did] not specifically seek out a ventilation shaft with the intention of placing harmful chemicals there." *See* Defendant's Version at 1. The government agrees that there did not appear to be any devious motives as far as the placement of the cyanide was concerned. *See* PSR, page 3, lines 75-78. After his arrest on the UIC campus, Mr. Konopka told authorities specifically the amounts and types of chemicals he stored in the subway. He then led the authorities to the storage room off of the CTA Blue Line where his belongings were kept. *See* PSR, page 2, lines 39-42.

Although Mr. Konopka has been involved with destructive acts in the past, these acts have all been directed at property. And while it may be pure luck that no person has ever been hurt by one of these acts, it seems clear that injuring people has never been Mr. Konopka's intention. Clearly, people could have been hurt as a result of these pointless and juvenile acts of property damage, but the fact remains that no one ever has ever been injured. If he had ever intended to hurt people, he could have easily arranged it. Harming people has never been his

4

intention in the past, and it was not his intention in this case. Mr. Konopka has been a vandal and a danger to property, not to people. At the time he took the chemicals, he never imagined that having possession of the two bottles of cyanide would result in his being charged with the federal crime of possession of a chemical weapon. He simply did not view the chemicals as any sort of weapon. While he does not dispute that the guidelines classify him as an individual in possession of a chemical weapon, he never saw himself in that light until he was arrested and charged with this offense. As Mr. Konopka explains in his letter to the Court: he, his family and "certainly many others were shocked by the phrase 'Chemical Weapon' and the mental image that goes with it. I am very regretful of all the fear and anxiety this case has caused. I hope that the Court and, more importantly, the public, can understand that I meant no one any harm."

     **B.**     **Mr. Konopka Should Be Sentenced Near the Low End Of the Guideline Range Because Guideline §2M6.1(a)(2) Is A Catch-All Provision Which Encompasses a Wide Range Of Conduct More Serious Than Simple Possession Of Cyanide.**

The government, the probation officer and Mr. Konopka are all in agreement that §2M6.1(a)(2) is the appropriate guideline to apply to this case. Guideline §2M6.1(a)(2) is a catch-all provision that foreseeably incorporates a wide range of conduct. Much of the conduct that would likely be encompassed by this catch-all provision is more serious that Mr. Konopka's simple possession of cyanide. Since Mr. Konopka's conduct is less serious than much of the conduct which would also fall under the catch-all provision of §2M6.1(a)(2), he should be sentenced near the low end of the guideline range.

Guideline §2M6.1 reads in part:

**§2M6.1.**     **Unlawful Production, Development, Acquisition, Stockpiling, Alteration,**

5

**Use, Transfer, or Possession of Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or delivery Systems, Chemical Weapons, or Weapons of Mass Destruction; Attempt or Conspiracy**

(a)    Base Offense Level (Apply the Greatest):

    (1)    **42**, if the offense was committed with intent (A) to injure the United States; or (B) to aid a foreign nation or a foreign terrorist organization;

    (2)    **28**, if subsections (a)(1), (a)(3), (a)(4), and (a)(5) do not apply;

    (3)    **22**, if the defendant is convicted under 18 U.S.C. §175b;

    (4)    **20**, if the defendant is convicted under 18 U.S.C. §175(b); or

    (5)    **20**, if the offense (A) involved a threat to use a nuclear weapon, nuclear material, or nuclear byproduct material, a chemical weapon, a biological agent, toxin, or delivery system, or a weapon of mass destruction; but (B) did not involve any conduct evidencing an intent or ability to carry out the threat.

Guideline §2M6.1(a)(1), (a)(3), (a)(4) and (a)(5) are fairly narrowly tailored to specific crimes and all parties are in agreement that none of them are applicable in this case. Guideline §2M6.1(a)(2) provides a catch-all provision that sets the base offense level at 28 "if subsections (a)(1), (a)(3), (a)(4) and (a)(5) do not apply."

Guideline §2M6.1(a)(2) covers a wide variety of conduct. This guideline provision encompasses simple possession of any chemical weapon, like in this case. However, §2M6.1(a)(2) also could encompass conduct that goes far beyond simple possession. For example, a defendant who made concerted efforts to acquire and stockpile chemical weapons, made a public threat to use the chemical weapons and displayed evidence of an intent to harm people with the chemicals would likely have the identical offense level as Mr. Konopka. The

6

presence or, more appropriate to this case, the absence of intent to use the chemicals for harm does not affect the offense level; the base offense level is twenty-eight whether there is evidence of intent or not.

While not minimizing the seriousness of Mr. Konopka's conduct, there is a wide discrepancy between Mr. Konopka's simple possession and a defendant who intentionally searched out and stockpiled a chemical, made a threat to use it, and showed an intent to use the chemical to injure people. The fact that there is no evidence that Mr. Konopka had any intent to use the chemicals to harm anyone should be reflected by a sentence at the lower end of the guideline range.

### C. Mr. Konopka Is A Young Man Who Does Have Potential To Turn His Life Around And Contribute To Society.

Mr. Konopka is an intelligent, young man who unfortunately until this point in his life has not lived up to his potential. Although he has used his talents to obtain a good job, he has not always used his talents in a constructive way. He does have an interest and vast knowledge in the area of computer technology. He was employed for almost five years as an internet technical support/system administrator. See PSR, page 18, lines 560-561. He enjoyed the job and the independence working with computers offered. The job involved a high degree of responsibility and he found the work to be intellectually stimulating. Mr. Konopka showed a strong commitment to his job and was on call by pager twenty-four hours a day. He functioned well in the controlled environment of the workplace and showed ability to excel in the area of computer technology.

Mr. Konopka has used his knowledge to provide help to others who did not possess the

7

same wealth of technological knowledge and skill that he did. Many times he volunteered his talent and time to assist others in dealing with their computer problems. *See* attached Exhibits: Cheryl Vanenberg Letter, Dawn Krull Letter, Pat Rempett Letter and Brenda Mueller Letter. In her letter, Dawn Krull, the Director of Health and Human Services for the American Red Cross, stated that "Joe has highly developed skills with computers and has proven himself to be not only helpful in his technical abilities, but has also shown a sense of compassion for others in his willingness to volunteer some of his talent and time." She described how Mr. Konopka donated his own time to create a computer program which assisted the Red Cross in keeping track of inventory and generating letters. Moreover, she explained how he took the time to do Red Cross data entry at home and how he assisted in transportation and maintenance for the Red Cross. *See* Dawn Krull Letter. On another occasion, Mr. Konopka traveled to assist a friend of his uncle with some computer problems. "He came and worked on it all evening, spent the night, and worked more in the morning without any monetary expectations." *See* Cheryl Vandenberg Letter.

Another example where Mr. Konopka has demonstrated his potential for kindness and generosity is with a young man named Blake Basch. Blake credited Joe Konopka with playing a major role in convincing him to quit abusing drugs, alcohol and cigarettes. Blake's mother, Lynel Grover, also credited Mr. Konopka with playing a major role in getting her son to stop using drugs and alcohol by getting him interested in computers and music. *See* Lynel Grover Letter.

Moreover, Blake Basch credited Mr. Konopka for sparking his interest in computers and technology. He explained that if "it was not for Joe helping [him] gain a strong computer

8

foundation [he] would have never been in college to begin with." *See* Blake Basch Letter. Blake also described how he could not afford to pay tuition for his winter semester at the local technical college, and how Mr. Konopka paid his entire tuition and for part of his book costs. Blake never once asked Mr. Konopka to pay these bills for him, Mr. Konopka "did it out of the kindness of his own heart." *See* Blake Basch Letter. Blake explains that once he was in a better situation financially, he offered to pay back the money, but Mr. Konopka told him to forget about it and just keep the money. Blake maintains that without Mr. Konopka's help, he "would have dropped out of college, and never gotten anywhere." *See* Blake Basch Letter.

Still, Mr. Konopka recognizes that these examples of his potential for good do not outweigh his embarrassing history of vandalism and destruction of property. Because he used his talents in these unconstructive ways, he is facing serious consequences beyond whatever sentence he receives in this case. Next month Mr. Konopka is set to be sentenced in the U.S. District Court for the Eastern District of Wisconsin. The plea agreement in that case reflects that the parties have agreed to recommend a sentence of imprisonment of not less than twenty years. See PSR, page 12, lines 335-337. This sentence may be run consecutively or concurrently to whatever sentence he receives in this case. In addition, he still faces prosecution in several county courts in Wisconsin after his federal criminal matters are resolved. See PSR, pages 12-13, lines 339-398. His past behavior will be accounted for in one way or another by the sentence in this case, the Wisconsin federal case, and the county prosecutions. Mr. Konopka will surely be paying a very steep price for his misguided and destructive behavior.

Mr. Konopka's participation in such pointless and destructive activities appears to stem, in part, from an abnormal maturation process. Most people mature to a point where they realize

9

that it is unacceptable to participate in destructive activities for their own amusement. Part of the reason he engaged in these activities was to derive personal entertainment by observing the consequences of property damage. See PSR, page 11, lines 326-327. He had no political agenda or any other real purpose for anything he was doing. He was driven by a juvenile urge to see what would happen. A normal, mature individual in his twenties would realize that there are serious consequences for destructive behavior and that any derived personal entertainment is in no way worth the risks or the consequences. Unfortunately, Mr. Konopka is learning those lesson far too late.

Mr. Konopka may not have had a traditional rearing, but he did grow up in a supportive and loving environment. His grandparents along with his aunt and uncle did the best they could to fill the role of his parents. Mr. Konopka realizes that he is lucky to have a family that has offered so much support throughout this entire process. His family has made numerous long treks to visit Mr. Konopka while he has been in custody. They have made it clear to him that they are there for support and unconditional love. And although Mr. Konopka is facing a substantial amount of time in prison, this family support while he is incarcerated and when he is eventually released will be critical in getting him back on his feet to become a law-abiding, productive member of society.

Up until this point in his life, Mr. Konopka has for the most part wasted his talents on pointless and destructive activities. But at the age of 26, he does have time to turn his life around and contribute something to society. He is open to participating in any programs the Bureau of Prisons (BOP) may have to offer in terms of counseling or psychiatric treatment. Mr. Konopka also plans on doing whatever he can to remain as current as possible in his primary area of

10

interest, computer technology. The longer Mr. Konopka is in prison, the longer it will be until he is able to pick up the pieces of his life and move forward.

**III. Conclusion**

Mr. Konopka is neither requesting sympathy from this Court, nor suggesting that any of the circumstances noted above absolves him from full responsibility in this case. He is merely appealing to this Court to consider the mitigating circumstances involved in the case.

Therefore, Mr. Konopka respectfully requests that this Honorable Court consider these mitigating circumstances and sentence him to the low end of the agreed applicable guideline range- -135 months. This sentence of more than eleven years is a just and fair result when considering all of the circumstances presented in this memorandum.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By: _____
Matthew J. Madden

MATTHEW J. MADDEN
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8300

11

# See Case File For Exhibits